## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THE GEO GROUP, INC., | ) |
| | ) |
| Plaintiff/Counterclaim Defendant, | ) |
| | ) |
| v. | )    Case No. CIV-23-1014-G |
| | ) |
| HINTON ECONOMIC | ) |
| DEVELOPMENT AUTHORITY, a | ) |
| Public Trust, et al., | ) |
| | ) |
| Defendants/Counterclaimants. | ) |

## <u>ORDER</u>

Now before the Court are the Motion for Summary Judgment (Doc. No. 27) filed by Plaintiff The GEO Group, Inc. ("GEO") and the Motion for Summary Judgment (Doc. No. 28) filed by Defendants Hinton Economic Development Authority and The Town of Hinton, Oklahoma. Defendants have filed a Response to Plaintiff's Motion (Doc. No. 35), to which Plaintiff has replied (Doc. No. 36). Plaintiff has filed a Response to Defendants' Motion (Doc. No. 33), to which Defendants have replied (Doc. No. 37).

### I.  Standard of Review

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670

(10th Cir. 1998). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Id.*

Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or
- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A)-(B). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

"When the moving party does not have the ultimate burden of persuasion at trial, it has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). The movant can satisfy its initial burden by producing "affirmative evidence negating an essential element of the non-moving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its

burden of persuasion at trial." *Id.* (internal quotation marks omitted). If the movant carries this initial burden, the nonmovant must then "go beyond the pleadings and designate specific facts" that would be admissible in evidence in the event of trial "so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006); *see* Fed. R. Civ. P. 56(c)(1)(A).

When, however, the moving party has the burden of proof at trial, "a more stringent summary judgment standard applies." *Pelt*, 539 F.3d at 1280. The moving party cannot carry its burden by "pointing to parts of the record that [the movant] believes illustrate the absence of a genuine issue of material fact." *Id.* Rather, to obtain summary judgment on its own claims or defense, a movant "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.*

Regarding cross-motions for summary judgment, the Tenth Circuit has explained:

> "The filing of cross-motions for summary judgment does not necessarily concede the absence of a material issue of fact. This must be so because by the filing of a motion a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 324-25 (10th Cir. 1967). Accordingly, "cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

*Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (alteration and citations omitted).

## II. Relevant Facts

Defendant The Town of Hinton, Oklahoma ("Hinton") is a municipality formed and operating pursuant to the Oklahoma Constitution and laws of the State of Oklahoma. Defs.' Mot. Summ. J. ¶ 1; Pl.'s Resp. at 8. Defendant Hinton Economic Development Authority ("HEDA") is a public trust created pursuant to title 60, sections 176-180.4 of the Oklahoma Statutes. Defs.' Mot. Summ. J. ¶ 2; Pl.'s Resp. at 8. HEDA was formed to enhance Hinton's ability to provide future economic growth, development, welfare, and prosperity. Defs.' Mot. Summ. J. ¶ 4; Pl.'s Resp. at 9. Hinton is HEDA's sole beneficiary. *See* Pl.'s Ex. 1 (Doc. No. 27-1).

In the early 1990s, HEDA issued bonds to finance the construction, and later improvements, of the Great Plains Correctional Facility (the "Facility"). *See* Defs.' Mot. Summ. J. ¶¶ 5-6; Pl.'s Resp. at 9. HEDA currently owns the Facility. Defs.' Mot. Summ. J. ¶ 7; *id.* Ex. 1 (Doc. No. 28-1); Pl.'s Resp. at 9.

### A. The Agreements

In late 1999 and early 2000, HEDA and Hinton entered into a "Lease Agreement" and an "Intergovernmental and Private Prison Contractor Agreement" (the "IPPCA") for the Facility with Cornell Corrections of Oklahoma, Inc. ("Cornell"). *See* Pl.'s Mot. Summ. J. ¶¶ 2, 12; *id.* Ex. 3, Lease Agreement (Doc. No. 27-3); Pl.'s Mot. Summ. J. Ex. 4, IPPCA (Doc. No. 27-4); Defs.' Resp. at 3, 4.

#### 1. The Lease Agreement

The Lease Agreement, which reflects an effective date of December 31, 1999, and was signed by representatives of HEDA, Hinton, and Cornell on or around that date,

governs Cornell's rights and use of certain "Leased Premises," including the Facility. Pursuant to the Lease Agreement, Cornell is provided a leasehold interest in the Leased Premises for a renewable, 75-year term. *See* Lease Agreement § 2.02. Cornell is obligated to pay annual rent in the amount of $100,000, which may increase in the event of higher rates being paid to Cornell by government entities placing inmates at the Facility. *See id.* §§ 3.01, 3.02. The Lease Agreement provides that Cornell may "without restriction . . . sublease the Leased Premises, or any part thereof, to any Person, . . . without the necessity of giving notice to, or obtaining the consent of," HEDA. *Id.* § 9.01.

### 2. The IPPCA

The IPPCA, which reflects an effective date of March 1, 2000, and was signed by representatives of HEDA, Hinton, and Cornell on or around that date, governs these parties' relationship relative to the operation of the Facility. The IPPCA describes the authority granted to Cornell, the powers reserved to Hinton, and obligations of HEDA, Hinton, and Cornell. *See* IPPCA at 1-15. Relevant here, the IPPCA provides:

- Cornell shall be "the exclusive private prison contractor to manage, maintain and operate the Facility." *Id.* § 2.2.

- "Cornell shall have the sole and exclusive authority and duty to, at its expense, equip, maintain and operate the business affairs associated with the Facility." *Id.* § 3.1.

- HEDA and Hinton are obligated to pay Cornell a "base management fee" for Cornell's performance under the terms of the IPPCA, from which a "reserve" (sometimes referred to by the parties as the "inmate per diem") shall be retained by

HEDA. *Id.* §§ 4.1, 4.3. As discussed more fully below, the IPPCA specifies formulas for computation of both the "base management fee" and the "reserve." *Id.*; *see also id.* art. I.

- Cornell may assign to another its rights and obligations under the IPPCA "upon [HEDA, Hinton, and Cornell's] mutual consent." *Id.* § 7.1.

- Cornell may, "with the consent of [Hinton]," "assign, subcontract or contract directly with third party companies for the actual staffing and operation of the Facility." *Id.*[1]

### 3. GEO Succeeds Cornell

In August 2001, Cornell assigned its interest in the Lease Agreement to Municipal Corrections Finance, L.P. ("MCF"). Defs.' Mot. Summ. J. ¶ 37; Pl.'s Resp. at 9; *see* Pl.'s Ex. 6 (Doc. No. 27-6). Plaintiff The GEO Group, Inc. ("GEO") acquired Cornell in 2010 and acquired MCF in 2012. Defs.' Mot. Summ. J. ¶¶ 38-39; Pl.'s Resp. at 9.

### B. *GEO's Operation of the Facility*

By 2016, the Facility was being used to house federally supervised inmates through a contract between GEO and the United States Bureau of Prisons. Pl.'s Mot. Summ. J. ¶ 28; Defs.' Resp. at 12. In 2021, however, the BOP announced that it would not renew that

---

[1] The IPPCA states: "Any controversy or claim arising out of or related to this Agreement or breach thereof, shall be settled by binding arbitration . . . ." IPPCA § 8.10. Through the course of this litigation, no party has sought to enforce the arbitration agreement. Considering the relevant factors, the Court finds that the parties' litigation conduct constitutes a waiver of their right to demand arbitration. *See In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1205 (10th Cir. 2016) (citing *Peterson v. Shearson/Am. Express, Inc.*, 849 F.2d 464, 466-68 (10th Cir. 1988)); *Goodly v. Check-6 Inc.*, No. 16-CV-334, 2017 WL 3269080, at *1-2 (N.D. Okla. Aug. 1, 2017).

contract and was removing the federal inmates from the Facility.  Pl.'s Mot. Summ. J. ¶ 28; Defs.' Resp. at 12.

The Facility remained empty until 2023.  Pl.'s Mot. Summ. J. ¶ 29; Defs.' Resp. at 12; Pl.'s Ex. 5 (Doc. No. 27-5).  While the Facility was unoccupied, GEO paid to HEDA the $100,000 annual rent required in the Lease Agreement, but HEDA did not receive any additional funds in payment of the IPPCA's "reserve" or "inmate per diem."  Pl.'s Mot. Summ. J. ¶¶ 28-29; Defs.' Resp. at 12; Pl.'s Ex. 5.

*C. GEO Subleases the Facility to ODOC*

In April 2023, MCF entered into a Sublease Agreement with the Oklahoma Department of Corrections ("ODOC") for the Facility.  *See* Defs.' Mot. Summ. J. ¶ 40; Pl.'s Resp. at 14; Pl.'s Mot. Summ. J. Ex. 10, ODOC Sublease (Doc. No. 27-10).  Under the Sublease Agreement, GEO would not operate the Facility, as it previously had done. *See* Pl.'s Mot. Summ. J. ¶ 31; Defs.' Resp. at 12.  Instead, ODOC would staff, manage, and operate the Facility as its own prison.  Pl.'s Mot. Summ. J. ¶ 31; Defs.' Resp. at 12; *see* Pl.'s Ex. 7 (Doc. No. 27-7).  Since the Sublease Agreement took effect and ODOC began operating the Facility, GEO has paid to HEDA the $100,000 annual rent required by the Lease Agreement, but GEO has refused to pay HEDA any additional funds for the IPPCA "reserve" or "inmate per diem."  *See* Pl.'s Mot. Summ. J. ¶¶ 38, 42; Defs.' Resp. at 13.

*III. The Parties' Claims*

The parties dispute GEO's obligations under the Lease Agreement and the IPPCA (together, "the Agreements") as they relate to GEO's current arrangement with ODOC.  In November 2023, GEO brought this diversity action seeking a determination by the Court

of the parties' rights and obligations under the Agreements. *See* Compl. (Doc. No. 1) (citing 28 U.S.C. § 2201). Specifically, GEO requests entry of a declaratory judgment holding that GEO "has no obligation to make any payments to the Defendants under the terms of the IPPCA" and that GEO's obligation to Defendants is "limited to making rental payments that are owed under the existing Lease Agreement." *Id.* at 6.

In their counterclaim for "construction of certain written instruments" under Oklahoma law, Defendants ask that the Court—upon construing the Lease Agreement and IPPCA as a single, nonseverable agreement—declare that GEO is obligated to pay HEDA, in addition to the annual rent specified in the Lease Agreement, a monthly fee under the IPPCA's provision for a "reserve" or "inmate per diem" payment based on inmate population. Answer & Countercl. (Doc. No. 7) at 5-11 (citing Okla. Stat. tit. 60, § 175.23). Defendants also seek the following rulings:

- that GEO was not authorized to sublease the Facility while failing to fulfill its duties under the IPPCA and so the sublease to ODOC is therefore void and of no effect; and/or

- that GEO breached the Agreements by subleasing the Leased Premises, including the Facility, to ODOC in a manner that permits ODOC rather than GEO to operate the Facility and that Defendants are therefore entitled to terminate the Agreements; and/or

- that the Agreements are illusory and/or void as against public policy and/or serving no public purpose and are therefore of no force or effect.

*See id.* at 11.

*IV. Discussion*

Both sides seek summary judgment in their favor on Plaintiff's claim and on each aspect of Defendants' counterclaim. Pursuant to 28 U.S.C. § 2201, "[i]n a case of actual

controversy within its jurisdiction," the Court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a); *see also Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269, 1273-74 (10th Cir. 1989).

### A. Whether GEO Has Breached the Agreements

In its Motion for Summary Judgment, GEO seeks summary judgment in its favor on its own claim for declaratory relief, specifically requesting a declaration that: (1) GEO is not obligated under the IPPCA to pay Defendants the "reserve" or "inmate per diem"; and (2) in the current circumstances, GEO's sole payment obligation under the Agreements is to pay HEDA the $100,000 annual rental payment required by the Lease Agreement. *See* Pl.'s Mot. Summ. J. at 19-22, 26-32, 34-35. GEO additionally seeks summary judgment in its favor on Defendants' counterclaims premised on GEO's alleged breaches of the Agreements. *See id.* at 23, 29-32, 34-35; *see also* Pl.'s Reply at 4-7.

Defendants, in contrast, ask the Court to grant summary judgment in Defendants' favor on their counterclaims seeking a declaration that GEO is currently breaching the Agreements by (1) failing to pay HEDA the "reserve" or "inmate per diem" and (2) entering into a sublease agreement with ODOC that permits ODOC rather than GEO to operate the Facility. *See* Defs.' Mot. Summ. J. at 14-18.[2]

---

[2] Defendants' Motion for Summary Judgment also asserts that Defendants should be granted an award of "the damages sustained because of GEO's breach" of the Agreements. Defs.' Mot. Summ. J. at 14-18, 21. Defendants request that the Court, upon finding breach as a matter of law, reserve the issue of damages for determination at a subsequent hearing. *See id.* at 21. In their Counterclaim, Defendants do not plead a stand-alone claim for damages due to breach of contract, however. Rather, the Counterclaim asks the Court to

9

Both requests require the Court to interpret the provisions of the Agreements. Under Oklahoma law, which is expressly adopted in both the Lease Agreement and the IPPCA as the governing law for interpretation of those contracts, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Okla. Stat. tit. 15, § 154; *see also* Lease Agreement § 17.04; IPPCA § 8.2. "The interpretation of an unambiguous contract is a question of law to be determined by the court and may be decided on summary judgment." *Pub. Serv. Co. of Okla. v. Burlington N. R.R. Co.*, 53 F.3d 1090, 1096 (10th Cir. 1995) (citation omitted).

### 1. GEO Breached the IPPCA by Transferring the Authority to Operate the Facility to ODOC Without the Consent of Hinton/HEDA

"A breach of contract is a material failure of performance of a duty arising under or imposed by agreement." *Lewis v. Farmers Ins. Co.*, 681 P.2d 67, 69 (Okla. 1983). Defendants contend that the undisputed material facts show that GEO, by subleasing the Facility to ODOC in a manner that calls for ODOC to operate the Facility, breached the restrictions in the IPPCA on transfers of operational authority over the Facility. The Court agrees.

The Lease Agreement grants GEO the ability to sublet the Facility: "[GEO] may, without restriction, . . . sublease the Leased Premises, or any part thereof, to any Person . .

---

determine that GEO is required to make inmate per diem payments to HEDA, that GEO breached the Agreements in subleasing the Facility, and that due to GEO's breach Defendants "are . . . entitled to terminate" the Agreements. Answer & Countercl. at 11. Plaintiff's summary-judgment briefing did not object to Defendants' raising the breach-of-contract claim or the accompanying damages request, instead seeking summary judgment on the merits of the claim. *See, e.g.*, Pl.'s Reply at 4-7; Pl.'s Resp. at 20-25.

. without the necessity of giving notice to, or obtaining the consent of, [HEDA]."  Lease Agreement § 9.01.  The IPPCA, however, confers on GEO "the sole and exclusive authority and duty to, at its expense, equip, maintain and operate the business affairs associated with the Facility."  IPPCA § 3.1.

While the IPPCA allows for GEO's assignment or delegation of its operational authority, the agreement restricts such transfers to circumstances in which Hinton and/or HEDA consent.

First, the IPPCA permits GEO to assign to another entity GEO's rights and obligations under the IPPCA under certain conditions.  *See id*. § 7.1.  That provision is plainly not applicable here: the Sublease Agreement does not reflect—and no party has argued—that GEO, on its own or through its subsidiary MCF, assigned its rights and obligations under the IPPCA to ODOC, with or without HEDA and Hinton's consent.

Second, the IPPCA reserves the right to GEO to, "with the consent of [Hinton]," "assign, subcontract or contract directly with third party companies for the actual staffing and operation of the Facility."  *Id*.  GEO concedes that it is not acting as operator of the Facility under its arrangement with ODOC and that, under GEO's Sublease Agreement with ODOC, ODOC would "staff, manage, and operate the Facility as its own prison."  Pl.'s Mot. Summ. J. at 7, 14-15, 16, 23.  While GEO asserts that Hinton's consent to the sublease was unnecessary, and that Defendants were aware of GEO's plan to sublease to ODOC, GEO does not argue that Hinton consented, pursuant to IPPCA § 7.1, to GEO, on its own or through its subsidiary MCF, "assign[ing], subcontract[ing,] or contract[ing]" with ODOC to operate the Facility.  IPPCA § 7.1.

GEO instead points to another provision of the IPPCA as authorizing its transfer of operational authority to ODOC. Section 3.6 of the IPPCA provides:

> Except as [reserved to Hinton], [GEO] shall have the authority to prepare and execute all contracts for the design, construction, equipping, managing, maintaining, operating, or any sale or other disposition, of all or any part of the Facility, including, without limitation, the continuance or general operations of [the] Facility and the housing and medical care of inmates and the transportation of inmates to the Facility.

IPPCA § 3.6. GEO argues that IPPCA § 3.6, by authorizing GEO to "prepare and execute" agreements for the operation of the Facility, allowed GEO to unilaterally transfer operational authority over the Facility to ODOC. *See* Pl.'s Resp. at 17; IPPCA § 3.6. The Court disagrees with this interpretation of the IPPCA.

"A contract is to be construed as a whole, giving effect to each of its parts, and not construed so as to make a provision meaningless, superfluous or of no effect." *McGinnity v. Kirk*, 362 P.3d 186, 199 (Okla. 2015) (footnote omitted). Read in context, IPPCA § 3.6 addresses process—namely, who is to prepare and execute contracts—and not which contracts require or do not require mutual consent of the parties to the agreement. The broad interpretation of IPPCA § 3.6 argued for by GEO would render IPPCA § 7.1's provision that GEO may, "with the consent of [Hinton]," "assign, subcontract or contract directly with third party companies for the actual staffing and operation of the Facility" superfluous. Indeed, such a broad interpretation of IPPCA § 3.6—one that allows unilateral transfer of operational authority—would contradict both IPPCA § 7.1's provision for assignment of the role of operator (which requires Hinton's and HEDA's

consent) and IPPCA § 7.1's provision for delegation of operational functions (which requires Hinton's consent).

Accordingly, even considering the evidence in GEO's favor as the nonmovant, the Court finds that the record establishes, as a matter of law, that GEO has breached the IPPCA by transferring the authority to operate the Facility without obtaining the consent of Hinton and/or HEDA.

2. <u>GEO Did Not Breach the Agreements by Failing to Pay HEDA the "Reserve" or "Inmate Per Diem"</u>

Defendants contend that the undisputed material facts show that GEO breached the Agreements by failing to pay HEDA the "reserve" or "inmate per diem" specified in the IPPCA. The Court disagrees.

Article IV of the IPPCA sets out the compensation to be paid to GEO for its operation of the Facility, from which a portion may be reserved for HEDA. *See* IPPCA art. IV, at pp. 9-10. The arrangement is as follows: Defendants are obligated to pay GEO a "base management fee" for GEO's performance under the IPPCA. *See id.* § 4.1. The base management fee is calculated by multiplying the "Base Per Diem Rate"[3] by the

_____

[3] The term "Base Per Diem Rate" is defined as "the daily rate identified in any Inmate Contract." IPPCA art. I. The term "Inmate Contract" means "a contract between [Hinton] and/or [GEO] and a Jurisdiction, including the Oklahoma DOC, which describes the rights and obligations of the parties relative to the housing and care of inmates at the Facility." *Id.* A "Jurisdiction" is "any governmental entity that has sentenced the Inmate to a prison term and contracted with [GEO] and/or [Hinton] for the Inmate's housing and care in the facility." *Id.*

13

number of "Inmate Days,"[4] less the amount reserved to HEDA pursuant to § 4.3 of the IPPCA. *See id.*

The reserve to HEDA, provided for in IPPCA § 4.3, is specified to be either (a) $1.00 per inmate per day if the "Inmate Contract Per Diem" is $43.95 per inmate or less, or (b) up to $1.25 per inmate per day if the "Inmate Contract Per Diem" exceeds $43.95 per inmate. *See* IPPCA § 4.3. The Inmate Contract Per Diem is the amount to be paid by the relevant governmental entity (or "Jurisdiction") for each Inmate assigned to the Facility, pursuant to the Inmate Contract between that governmental entity and GEO and/or Hinton. *See id.* art. I, § 4.3.

GEO argues that the obligation to make this monthly Inmate Per Diem payment to HEDA under § 4.3 of the IPPCA is premised upon the existence of an "Inmate Contract" that establishes a "Base Per Diem Rate." *See* Pl.'s Mot. Summ. J. at 21. Therefore, according to GEO, if an Inmate Contract as defined in the IPPCA does not exist between GEO and a Jurisdiction, there can be no "Base Per Diem Rate" from which a Base Management Fee payment to GEO, and subsequently HEDA's Inmate Per Diem reserve, can be calculated. *See id.* at 21-22.

The parties agree that the only contract that exists between GEO and ODOC relating to the current operation of the Facility is the Sublease Agreement. *See* Pl.'s Mot. Summ. J. ¶ 33; Defs.' Resp. at 13. To constitute an "Inmate Contract" under the terms of the IPPCA, a contract must "describe the rights and obligations of the parties relative to the

---

[4] The term "Inmate Day" is defined to "mean[] each day an Inmate is assigned to the Facility." IPPCA art. I.

housing and care of inmates at the Facility." IPPCA art. I. The Sublease Agreement does not include any language describing the rights and obligations of either GEO or ODOC regarding the housing and care of inmates. Rather, it defines these entities as "Landlord" and Tenant" and prescribes various lease provisions—e.g., maintenance and care and inspections—for the leased premises (defined as a "certain medium security prison"). *See* Sublease Agreement at 21. Thus, the Sublease Agreement, by its express terms, does not meet the definition of an Inmate Contract pursuant to the IPPCA.

The Base Per Diem Rate is "the daily rate identified in any Inmate Contract." IPPCA art. I. The Court agrees with GEO that, under the "clear and explicit" language of the IPPCA, the absence of an Inmate Contract necessarily results in the absence of a Base Per Diem rate. Okla. Stat. tit. 15, § 154; *see Scrivner v. Sonat Expl. Co.*, 242 F.3d 1288, 1291 (10th Cir. 2001) ("If the language of a contract is clear and without ambiguity, the Court is to interpret it as a matter of law." (internal quotation marks omitted)); *see also* Okla. Stat. tit. 15, § 160 ("The words of a contract are to be understood in their ordinary and popular sense . . . .").

Stated differently, absent any such Inmate Contract, there is no source from which to derive this Base Per Diem Rate. Without a Base Per Diem, the Inmate Per Diem cannot be calculated under the terms of the IPPCA, and GEO cannot reasonably be required to pay Defendants the IPPCA § 4.3 inmate per diem. Accordingly, the undisputed material facts show as a matter of law that, in the current circumstances of GEO's sublease of the Facility to ODOC, GEO has no obligation to pay HEDA the "reserve" or "inmate per diem" described in the IPPCA and has not breached the Agreements by refusing to do so.

15

B. *Whether the Agreements Are Void and Unenforceable Under Oklahoma Law*

Both parties seek summary judgment on Defendants' counterclaim, wherein Hinton and HEDA seek a declaration that the Agreements are void and unenforceable under the Oklahoma Constitution. *See* Answer & Countercl. at 11; Pl.'s Mot. Summ. J. at 32-35; Defs.' Mot. Summ. J. at 19-21. In support, Defendants argue that as a result of GEO subleasing the Facility to ODOC, the Facility is not being used to fulfil a "public purpose" as required by article X, section 14 of the Oklahoma Constitution and, instead, the Agreements represent an improper "gift" or "gratuitous transfer" to GEO, providing "very little benefit" to Defendants. Defs.' Mot. Summ. J. at 19-21.

Article X, section 14 of the Oklahoma Constitution prescribes that "taxes shall be levied and collected . . . for public purposes only." Okla. Const. art. X, § 14. The provision "restricts the use of public funds to expenditures for a public purpose." *Burkhardt v. City of Enid*, 771 P.2d 608, 610 (Okla. 1989). Pursuant to article X, section 17 of the Oklahoma Constitution, "[t]he Legislature shall not authorize any . . . town . . . to obtain or appropriate money for, or levy any tax for, or to loan its credit to any corporation, association, or individual." Okla. Const. art. X, § 14. This restriction "was adopted for the purpose of preventing the investment of public funds in private enterprises." *Lawrence v. Schellstede*, 348 P.2d 1078, 1082 (Okla. 1960).

HEDA, a public trust, may only exercise the powers that Hinton, its municipal beneficiary, is authorized to exercise or those authorized to it by the Legislature. *See Immel v. Tulsa Pub. Facilities Auth.*, 490 P.3d 135, 145 (Okla. 2021). Oklahoma courts have recognized that economic development is a "legitimate public purpose" for which a

16

municipality may expend public funds. *Burkhardt*, 771 P.2d at 611. "The term 'public purpose' in article 10, section 14, should not be construed in a narrow or restrictive sense." *Id.* at 610 (internal quotation marks omitted). Public funds may be spent for economic development "in concert with private actors," such as GEO, so long as constitutional requirements are met. *Id.* at 614. An economic development plan will generally withstand constitutional challenge if it serves the legitimate public purpose of promoting the general welfare, economic security, and prosperity of a municipality and its citizens. *See State ex rel. Brown v. City of Warr Acres*, 946 P.2d 1140, 1145 (Okla. 1997). And, as to article X, section 17, relevant Oklahoma authority law "suggest[s] that *any* public purpose associated with a municipal expenditure will ordinarily defeat a claim of constitutional infirmity under" that provision. *Rural Water Dist. No. 3, Pushmataha Cnty. v. Antlers Pub. Works Auth.*, 866 P.2d 458, 460 (Okla. Civ. App. 1993) (emphasis added); *see also Childrens Home & Welfare Ass'n v. Childers*, 171 P.2d 613, 614 (Okla. 1946).

Defendants argue that because GEO has impermissibly used the Facility without adequate limitations, the Court should declare the Agreements void and unenforceable under the authorities cited above. While the Court has found that GEO breached the IPPCA, it cannot be said that the Agreements, by their terms, violate the Oklahoma Constitution. The Agreements provide for the benefit of citizens of Hinton and of the State of Oklahoma by generating revenue in the form of GEO's rental payments and promoting the general welfare and security. Defendants have not pointed to any fact, disputed or undisputed, establishing that the Agreements are void and unenforceable due to violation of the cited provisions of the Oklahoma Constitution.

CONCLUSION

As outlined above, Plaintiff's Motion for Summary Judgment (Doc. No. 27) is GRANTED IN PART and DENIED IN PART. Likewise, Defendants' Motion for Summary Judgment (Doc. No. 28) is GRANTED IN PART and DENIED IN PART. Specifically:

- Defendants are entitled to summary judgment on their counterclaim to the following extent: for the reasons set forth above, and applying the standards set forth in Federal Rule of Civil Procedure 56, the Court determines as a matter of law that GEO breached the IPPCA by unilaterally transferring operational authority for the Facility to ODOC. To the extent that Defendants seek a remedy, beyond this declaration, for GEO's breach of the IPPCA, the Court finds that Defendants have not established an entitlement to summary judgment in their favor with respect to any such relief. The Court directs Defendants to submit a brief to the Court within 14 days of this Order addressing what, if any, issues remain outstanding and whether such issues are properly resolved by jury trial, nonjury trial, or other hearing. The Court further directs that Plaintiff shall submit a brief addressing the same questions, and presenting any response to Defendants' submission, within 14 days of Defendants' submission.

- Plaintiff is entitled to summary judgment in its favor on its claim and Defendants' counterclaim as to Plaintiff's contention that it has no obligation to pay a "reserve" or "inmate per diem" to HEDA. Defendants are not entitled to summary judgment on this claim or counterclaim.

-and-

- Plaintiff is entitled to summary judgment on Defendants' counterclaim seeking to hold the parties' contracts void and unenforceable under Oklahoma law; correspondingly, Defendants are not entitled to summary judgment on this counterclaim.

Judgment shall be entered in accordance with this determination at the conclusion of this litigation.

IT IS SO ORDERED this 24th day of September, 2025.

CHARLES B. GOODWIN
United States District Judge